**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EASTMAN KODAK ERISA LITIGATION | **MASTER FILE NO. 6:12-CV-06051-DGL** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | JURY TRIAL DEMANDED |

**CONSOLIDATED COMPLAINT FOR
BREACH OF ERISA'S FIDUCIARY DUTIES**

Plaintiffs, Mark Gedek, Mark J. Nenni, Andrew J. Mauer, Thomas W. Greenwood, Barry Bolger, Julius Coletta, Dale Toal, Claude Matte and Allen E. Hartter (collectively "Plaintiffs"), individually, as representatives of the Eastman Kodak Employees' Savings and Investment Plan (the "SIP") and the Kodak Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plans"), and, to the extent appropriate, on behalf of a class of similarly situated participants in the Plans (the "Participants"), by their attorneys, allege the following:

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.      This is a class action brought pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries.

2.      Plaintiffs, Participants in the Plans, bring this action concerning the Plans' investment in the stock of The Eastman Kodak Company ("Kodak" or "the Company"), individually, as representatives of the Plans and, to the extent appropriate, on behalf of a class of all Participants in the Plans for whose individual accounts the Plans invested in funds which invested primarily in Kodak stock  (the "Funds"), from January 1, 2010 through and including the date of liquidation of the Plans (the "Class Period").

3.      This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiffs' claims apply to the Plans, inclusive of all Participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiffs to sue for relief for the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this lawsuit on behalf of the Plans and all Participants and beneficiaries of the Plans during the proposed Class Period.

4.      As more fully set forth below, Defendants breached their fiduciary duties owed to the Plans and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result of these breaches, Defendants are liable to the Plans for all losses resulting from each such breach of fiduciary duty.  Plaintiffs also seek equitable relief.

5.      Counts I (regarding the SIP) and II (regarding the ESOP) allege that it was imprudent to (1) permit the Plans to offer the Funds as investment options, (2) permit the Plans to invest in the Funds, and (3) permit the Funds to invest in, and remain invested in, Company stock, because, *inter alia*, objective public information revealed that the Funds and Company stock were extremely risky investments which were imprudent for the investment of retirement assets.  Specifically, Kodak's financial condition – as set forth in detail below – had deteriorated to the point that, by the start of the Class Period, Defendants knew or should have known that the Company was in "dire circumstances."

6.      Defendants allowed the imprudent investment of the Plans' assets in Kodak stock throughout the Class Period despite the fact that Defendants clearly knew or should have known that Kodak was in dire circumstances and that such investment was imprudent due to, as explained below in detail and among other things, the fact that the Company:  (a) depended on a dying technology and the sale of antiquated products no longer sought by the consumer; (b) was unable to bring new products to the market to counter the rapidly declining profits from the sales of its antiquated products; (c) was unable to generate sufficient cash-flow from its short term business strategy of initiating lawsuits, which would presumably garner settlements, to maintain the Company's cash flow; (d) was suffering from a severe lack of liquidity; and (e) its stock price collapsed because of the above dire circumstances.

3

7.      A prudent fiduciary would have recognized that as a consequence of the above, the Plans' significant investment of employees' retirement savings in Company stock would inevitably result in devastating losses to the Plans and, consequently, to the Plans' Participants.

8.      Notably, on January 19, 2012, Kodak filed for Chapter 11 bankruptcy protection. Throughout the Class Period (as defined below) through this bankruptcy filing, Defendants failed to take any ameliorative action to protect the Plans or their Participants from inevitable losses.

9.      Count III alleges that all Defendants are liable for their co-fiduciaries breaches because they (i) knew of the other fiduciary's breaches and failed to remedy them, (ii) knowingly participated in a breach, and/or (iii) enabled the fiduciary breach through their own actions/inactions.

## JURISDICTION AND VENUE

10.     Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

11.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where the Plans are administered, where the breaches took place and where one or more Defendants reside or may be found.

## NON-PARTIES

### *The Eastman Kodak Company*

13.     The Eastman Kodak Company ("Kodak") is a New Jersey Corporation with its principal place of business in Rochester, NY.  According to its public filings, Kodak is the world's foremost imaging innovator and generates revenue and profits from the sale of products, technology, solutions and services to consumers, businesses and creative professionals.  Among

4

other things, Kodak is the Sponsor of the Plans.  Kodak is not a Defendant because it filed for

bankruptcy.  Plaintiffs, however, reserve the right to add Kodak as a Defendant in the event

Kodak is denied bankruptcy protection or Plaintiffs are otherwise permitted to add Kodak as

defendant in this action.

## THE PARTIES

### *The Plaintiffs*

14.     Plaintiff Mark Gedek ("Plaintiff Gedek") is a "Participant" in the Plans, within

the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement

investment portfolios during the Class Period.

15.     Plaintiff Mark J. Nemi ("Plaintiff Nemi") is a "Participant" in the Plans, within

the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement

investment portfolios during the Class Period.

16.     Plaintiff Andrew J. Mauer ("Plaintiff Mauer") is a "Participant" in the Plans,

within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his

retirement investment portfolios during the Class Period.

17.     Plaintiff Thomas W. Greenwood ("Plaintiff Greenwood") is a "Participant" in the

Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his

retirement investment portfolios during the Class Period.

18.     Plaintiff Barry Bolger ("Plaintiff Bolger") is a "Participant" in the Plans, within

the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement

investment portfolios during the Class Period.

19.     Plaintiff Julius Coletta ("Plaintiff Coletta") is a "Participant" in the Plans, within

the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement

investment portfolios during the Class Period.  Notably, Plaintiff Coletta was an employee of Kodak for some thirty-three (33) years.

20.     Plaintiff Dale Toal ("Plaintiff Toal") is a "Participant" in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement investment portfolios during the Class Period.

21.     Plaintiff Claude Matte ("Plaintiff Matte") is a "Participant" in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement investment portfolios during the Class Period.

22.     Plaintiff Allen E. Hartter ("Plaintiff Hartter") is a "Participant" in the SIP Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement investment portfolio during the Class Period.

23.     Plaintiffs Gedek, Mauer, Greenwood, Bolger, Coletta, Toal, Matte, and Hartter are collectively referred to as the "Plaintiffs" in this Consolidated Complaint.

*The Defendants*

*The Committee Defendants[1]*

24.     As set forth below, each Plan was managed by a specific committee.  Notably, during the Class Period, the membership in these committees was identical.  Defendant Savings and Investment Plan Committee ("SIPCO") was the Plan Administrator and Named Fiduciary of the SIP.

---

[1] Based on representations made by Defense counsel, there appear to be at least two individuals who were added to the committees in January 2012, Robert Leonard and Patrick Sheller.  Based on the representation that these two individuals did not participate in the committees until near the end of the Class Period, Plaintiffs' Interim Co-Lead Counsel have determined not to include them as Defendants to this action.  Should discovery prove otherwise, Plaintiffs will seek leave to amend to add them as parties to this action.

25.    Defendant Stock Ownership Plan Committee ("SOPCO") was the Plan Administrator and named fiduciary of the ESOP.[2]

26.    On information and belief, Defendants SIPCO and SOPCO are both unincorporated associations of the Company.

27.    Membership in the SIPCO and SOPCO was predicated on the individual having a specified, top level, position within Kodak.  Those positions were: the Chief Financial Officer (CFO); General Counsel; Director, Human Resources; Treasurer; and Director, Worldwide Total Compensation. *See* Savings and Investment Plan, Effective Date: January 1, 2010 ("SIP Document"), Sec. 2.33; Kodak Employee Stock Ownership Plan, Effective Date: August 1, 2009 ("ESOP Document"), Sec. 2.36.

28.    The SIPCO and SOPCO are collectively referred to herein as the "Committees."

29.    Kodak's Chief Financial Officer chaired SIPCO during the Class Period. According to Kodak's public filings, the CFO was responsible for Kodak's worldwide financial operations, including Corporate Financial Planning and Analysis, Treasury, Audit, Controllership, Tax, Investor Relations, Aviation, Corporate Business Development, Worldwide Information Systems, and Global Purchasing.

30.    Defendant Frank S. Sklarsky ("Sklarsky") was the Company's Chief Financial Officer ("CFO") from November 13, 2006 until his departure from Kodak in November 2010. Accordingly, Sklarsky served as the Chair of SIPCO for a portion of the Class Period.  As the Chair of SIPCO, Sklarsky signed the Plan's Form 11-K filed with the Securities and Exchange Commission for the year ending December 31, 2009, on June 21, 2010.  Defendant Antoinette P.

---

[2] Counsel for Defendants have represented that Paul Dils, named in several of the initial complaints, only performed ministerial tasks on behalf of the ESOP Administrator and did not have any involvement in the actual administration of the Plans.   On information and belief, Defendant Dils served as Kodak's Chief Tax Officer and Vice President of the Company's Corporate Finance Group.

McCorvey ("McCorvey") joined Kodak in 1999.  Ms. McCorvey has served as Kodak's CFO since November 5, 2010, when she replaced Mr. Sklarsky.  Accordingly, for a portion of the Class Period, Ms. McCorvey served on the Plans' Committees.  She also served as the Chair of SIPCO.  As the Chair of SIPCO, McCorvey signed the Plan's Form 11-K filed with the Securities and Exchange Commission for the year ending December 31, 2010, on June 23, 2011.  Prior to becoming the Company's CFO, Ms. McCorvey held numerous positions within Kodak including, Director & Vice President of Investor Relations and Corporate Vice President.  Her initial position with the Company was as director of finance of imaging materials manufacturing.

31.    Defendant Robert L. Berman ("Berman") served as the Company's Chief Human Resources Officer from January 2002 to December 2011.  As the Director of Human Resources, Mr. Berman served on the Plans' Committees through December 2011.  Presently, Mr. Berman is a Senior Vice President with the Company and reports to the CEO in a project leadership capacity.

32.    Defendant William G. Love ("Love") served on the Plans' Committees during the Class Period due to his position at Kodak as its Treasurer.  Indeed, in November of 2002, Love signed the Trust Agreement between Boston Safe Deposit and Trust Company and Kodak as the Company's Treasurer. Mr. Love initially joined the Company in October 1997 and was elected its Treasurer on October 2, 2000.

33.    Defendant Patricia A. Obstarczyk ("Obstarczyk") served on the Plans' Committees during the Class Period.  From August 2005 through the present, Obstarczyk served as Kodak's Director Global Benefits & Vice President Human Resources.  Indicative of her duties as a member of the SIPCO, Obstarczyk signed the Form 15-12B filed with the Securities

and Exchange Commission on March 23, 2012, on behalf of the SIPCO.  The Form 15-12B indicated that Kodak securities were no longer being offered as an investment option for the SIP.

34.   Defendant Joyce P. Haag ("Haag") served as Kodak's Senior Vice President and General Counsel until her forced retirement due to a consolidation of positions in November of 2010.  Her official last day of employment with the Company was December 31, 2010.  She had served as Kodak's General Counsel since July 2005.  Due to her position as Kodak's General Counsel, Ms. Haag served on the Plans' Committees for a portion of the Class Period.

35.   Defendant Laura G. Quatela ("Quatela") served on the Plans' Committees during a portion of the Class Period due to her employment as Kodak's General Counsel from January 1, 2011 until approximately December, 2011.  Prior to becoming the Company's General Counsel, Ms. Quatela held the position of Chief Intellectual Property Officer and Vice President, Eastman Kodak Co.

36.   Defendants Sklarsky, McCorvey, Berman, Haag, Love, Obstarczyk and Quatela are hereafter collectively referred to as the "Individual Committee Defendants," and the Individual Committee Defendants, SIPCO and SOPCO are collectively referred to as the "Committee Defendants."

### *The Trustee Defendants*

37.   Defendant Boston Safe Deposit and Trust ("Boston Safe Deposit") is the trustee of the SIP. *See* Eastman Kodak Employees' Savings and Investment Plan Trust Agreement (2002 Restatement) ("SIP Trust Agreement").  Boston Safe Deposit is a Massachusetts based trust company with its principal place of business located at One Boston Place, Boston, Massachusetts and is an affiliate of BNY Mellon Corporation.

38.     According to the SIP Annual Report, Defendant BNY Mellon Financial Corporation is the trustee of the SIP ("BNY Mellon").  On information and belief, BNY Mellon is a wholly owned subsidiary of BNY Mellon Corporation with its principal place of business is 1 Wall Street, New York, NY 10286.  Boston Safe Deposit and BNY Mellon are hereinafter referred to as "Boston Safe Deposit."

39.     Defendant T. Rowe Price Trust Company ("T. Rowe Price") is the trustee of the ESOP.  *See* Trust Agreement Between T. Rowe Price Company and Eastman Kodak Company, effective March 1, 2002 ("ESOP Trust Agreement").

40.     Boston Safe Deposit, T. Rowe Price and BNY Mellon are hereinafter referred to as the Trustee Defendants.

## CLASS ACTION ALLEGATIONS

41.     To the extent appropriate, Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, excluding Defendants, who were participants in or beneficiaries of the Eastman Kodak Employees' Savings And Investment Plan and/or the Kodak Employee Stock Ownership Plan at any time between January 1, 2010 and the date of the final liquidation of the Plans (the "Class Period") and whose Plans' accounts included investments in Kodak common stock (the "Class").

42.     The members of the Class, which is estimated to number in the thousands, are so numerous that joinder of all members is impracticable.  Indeed, based on public filings by the Plans, there are potentially thousands of class members.  For instance, based on the Kodak's Form 5500 Annual Returns filed with the Department of Labor ("DOL") and dated January 14, 2011, there are 34,436 Participants in the SIP for the plan year ending December 30, 2010, and

the September 29, 2011 Form 5500 lists 15,095 Participants in the ESOP Plan for the plan year ending December 31, 2010.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

     (a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiffs and members of the Class;

     (b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

     (c)     whether Defendants violated ERISA; and

     (d)     whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, the Plans and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

45.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Plans or the Class.

46.     Class action status is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

47.     Class action status is also warranted under Rule 23(b)(1)(A) because  prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

48.     Class action status is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

49.     Class action status is warranted under Rule 23(b)(3) because a class action would be superior to individual actions and common questions of law and fact predominate over individual questions.

## DESCRIPTION OF THE PLANS

50.     At all times relevant to this Complaint, the Plans were employee benefit plans within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

51.     At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), in that the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

### *The Savings and Investment Plan*

52.     The stated purpose of the Savings and Investment Plan "is to assist Employees of the Company in an orderly and systematic savings and investment program…." SIP Document, Sec. 1.01.

12

53.     Another purpose of the SIP was to be managed in accordance with the interests of

Participants and beneficiaries. According to SIP Document Sec. 3.10:

> All fiduciaries under the Plan and Trust will act solely in the interests of
> the Participants and their beneficiaries and in accordance with the terms
> and provisions of the Plan and Trust insofar as such documents are
> consistent with ERISA, and with the care, skill, prudence, and diligence
> under the circumstances then prevailing that a prudent person acting in a
> like capacity and familiar with such matters would use in the conduct of
> and enterprise of a like character and with like aims.

54.     According to the SIP, any "Employee is eligible to become a Participant in the

Plan on the first day of his employment." SIP Document, Sec. 4.01.

55.     The SIP provided that Participants could direct portions of their compensation

into the SIP. In particular, an employee could have up to seventy-five percent (75%) of his or

her aggregate Wage Dividend and Qualifying Compensation deferred to the SIP. SIP Document,

Sec. 6.01. This amount was subject to the applicable dollar limitation set forth in Internal

Revenue Code section 402(g). *Id.*, Sec. 6.02.

56.     During the relevant period, Kodak made matching contributions to qualified

Participant accounts.[3]   In order to qualify for a matching contribution, a participant had to (i)

have an accruing cash balance benefit under Appendix N of the Kodak Retirement Income Plan

and (ii) elect to defer a percentage of their Qualifying Compensation to the SIP. *See* SIP

Document, Sec. 5.02(a)(1).

57.     The matching contribution was set at one hundred percent (100%) of the

participant's deferral to the SIP that does not exceed one (1) percent of Qualifying Compensation

for that payroll period and fifty (50) percent of the participant's deferral that exceeds one percent

but does not exceed five percent of the Qualifying Compensation. SIP Document, Sec.

---

[3] Prior to the start of the Class Period, the Company suspended its matching contributions effective January 1, 2009.
This was lifted at the start of the Class Period.

5.02(a)(2). For Participants who reached the dollar limitation contribution to the SIP prior to the end of the Plan year, their matching contributions would not be less than three (3) percent of their Qualifying Compensation. *Id.*

58. All elective contributions and matching contributions were "fully vested at all times." SIP Document, Sec. 5.05.

59. Matching contributions where to be invested "in the same manner as the Participant's Elective Contributions . . ." SIP Document, Sec. 7.01.

60. The SIP mandated that the Trustee maintain "an investment option that consists primarily of Employer Securities known as the Kodak Stock Fund" as well as a "range of investment alternatives selected by SIPCO…" SIP Document, Sec. 7.01(b).

61. The SIP placed specific qualifications on the Kodak Stock Fund. In relevant part, it stated:

> The Kodak Stock Fund is a portion of the Plan that is a stock bonus plan designated as an employee stock ownership plan under section 4975(e)(7) of the Code and section 407(d)(6) of ERISA. Although the Kodak Stock Fund must be made available for investment, *no Participant or beneficiary is required to invest in the Kodak Stock Fund*. SIPCO will at all times ensure that the Plan maintains a menu of other investment options sufficient to satisfy the diversification requirements of Code section 401(a)(35), and that Participants and beneficiaries are permitted to reduce or discontinue investment in the Kodak Stock Fund in accordance with Code section 401(a)(35).

SIP Document, Sec. 7.01(c) (emphasis added).

62. Accordingly, the SIP did not provide that a purpose of the SIP was to invest in the Kodak Stock Fund, particularly if it was an imprudent and unduly risky investment for retirement savings. Accordingly, as manifested by the specific terms of the SIP, Kodak did not

14

intend when it adopted and sponsored the SIP that SIP assets be invested in the Kodak Stock

Fund, particularly when the Fund was an inappropriate investment for retirement savings.

### *The ESOP*

63.     According to relevant plan documents, the ESOP "is a stock bonus plan" and

"shall constitute an employee stock ownership plan under section 4975(e)(7) of the Code and

section 407(d)(6) of ERISA.  *See* Kodak Employee Stock Ownership Plan, Effective Date:

August 1, 2009 ("ESOP Document"), Sec. 1.04.

64.     The ESOP was designed for the exclusive benefit of Kodak's employees.   In

relevant part, the ESOP states:

> All contributions made pursuant to the plan shall be held by the Trustee in
> accordance with the terms of the Trust Agreement for the exclusive
> benefit of those Employees who are Participants under the Plan, including
> former Employees, and their Beneficiaries, and shall be applied to provide
> benefits under the Plan and to pay expenses of administration of the Plan
> and the Trust, to the extent that such expenses are not otherwise paid.

65.     Each individual who is employed by Kodak, or one of its affiliates, "on the last

scheduled workday of the Company's fiscal year ending within the Plan Year for which a

contribution will be made to the Trust" and was credited with at least one hour of service for the

prior Plan Year is eligible to receive an allocation under the ESOP.  ESOP Document. 4.01, 4.02.

66.     Kodak's Board of Directors' determines the Company's contributions for each

Plan Year.  ESOP Document, Sec. 5.01.

67.     Individual Participants were neither required nor permitted "to make contributions

to the Plan or Trust."   ESOP Document, Sec. 5.01(d).

68.     The ESOP's trust fund was to be "invested primarily in Employer Securities."

ESOP Document, Sec. 6.01.  "Employer Securities" includes both "Convertible Preferred Stock

and Kodak Stock." ESOP Document, Sec. 2.15.  According to account statements provided to

Participants, this fun is also named the Kodak Stock Fund.

69.     Notably, however, the ESOP permitted the Trustee to

> invest the Trust Fund in savings accounts, certificates of deposit, high-
> grade short-term securities, equity stock, bonds, or other investments
> desirable for the Trust, or the Trust Fund may be held in cash.  All
> investments, except those made in the course of short-term cash
> management, will be made by the Trustee only upon the direction of
> SOPCO.  SOPCO may direct that the entire Trust Fund assets be invested
> and held in Employer Securities.

ESOP Document, Sec. 6.01.  Thus, the ESOP could invest in virtually any investments, not just

Kodak securities.

70.     Each Participant in the ESOP was at all times 100% vested in their ESOP

account.  ESOP Document, Sec. 8.05.

## DEFENDANTS WERE FIDUCIARIES

71.     ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan."  ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1).

72.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under

§ 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary

functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority

or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan,

or has any authority or responsibility to do so, or (iii) he has any discretionary authority or

discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

73.     Each of the Defendants was a fiduciary during the Class Period as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plans and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

74.     SIPCO and the Individual Committee Defendants were fiduciaries of the SIP. Pursuant to the SIP Document, SIPCO was the "Named Fiduciary" and the "Administrator" of the SIP as these terms are used under ERISA.  SIP Document, Sec. 3.02.

75.     SIPCO had the duty to administer the SIP and the power necessary to carry out all provisions of the SIP.  SIP Document, Sec. 3.03.  In particular, SIPCO had the power:

> to select, monitor and administer investment options, and implement investment option and Plan changes, as it deems appropriate, including, without limitation:
>
> A.  suspending any or all account activity;
>
> B.  restricting deferrals, transfers and reallocations; and
>
> C.  directing deferrals and account balances to investment options other than those elected.

SIP Document, Sec. 303(b)(7).

76.     In addition, SIPCO had the power to appoint and remove the Trustee, and the power to administer the SIP.  SIP Document, Sec. 3.12.

77.     In addition, SIPCO was a fund manager of the SIP's Kodak Stock Fund.  The information sheet titled "Kodak Stock Fund" available to Participants via the SIP Record

Keeper's website at https://www3.troweprice.com/rws/rps/public/assets/internalffs/ KODAK.pdf

states "The Savings and Investment Plan Committee (SIPCO); 343 State Street; Rochester, New

York 14650-1112 (telephone number: 1-585-724-4800) is the fund manager."  SIPCO had the

duty to determine the amount of cash held by the Kodak Stock Fund.  SIP Trust Agreement,

§ 2.02.

78.     SOPCO and the Individual Committee Defendants were fiduciaries of the ESOP

Plan.  Pursuant to the ESOP Document, SOPCO was the "Named Fiduciary" and the "Plan

Administrator" of the ESOP as these terms are used under ERISA.  ESOP Document, Sec. 3.02.

79.     SOPCO had the duty to direct the Trustee concerning the investment and

diversification of the ESOP's Kodak Stock Fund.  ESOP Trust Agreement, § 2.1.

80.     In addition, SOPCO "is responsible for appointing and removing the Trustee, and

for administering the Plan . . ."  ESOP Document, Sec. 3.12.

81.     Boston Safe Deposit was a fiduciary of the SIP because it was "responsible for the

management and control of the Plan assets to the extent provided in the Trust."  SIP Document,

Sec. 3.12.

82.     In addition, Boston Safe Deposit "is authorized to keep any portion of any of the

Funds as it may deem advisable from time to time in cash or liquid investments."   SIP

Document, Sec. 7.02.  Consequently, Boston Safe Deposit was vested with the authority to sell

Kodak stock held by the Fund at any time it became "advisable," including when Kodak stock

became an imprudent investment as alleged below.

83.     Further, the SIP Trust Agreement specifically authorizes Boston Safe Deposit to

"take all action, whether or not expressly authorized, which the Trustee may deem necessary or

desirable for the fulfillment of its duties . . ." SIP Trust Agreement, Sec. 3.01(p).

18

84.     Defendant T. Rowe Price, the ESOP's Trustee, had fiduciary responsibility over the ESOP.  According to the ESOP Document:

> To meet the Trust's administrative requirements, as determined by the Trustee, the Trustee may retain some part of the Trust Fund in liquid investments (including interest-bearing accounts and certificates of deposit within its own banking department) or may sell Employer Securities.

ESOP Document, Sec. 12.03.

85.     Further, the ESOP Trust Agreement provides that the "Trustee shall have the power to hold all or a portion of the Trust Fund uninvested pending receipt of *clear and proper investment directions . . .*"  ESOP Trust Agreement, Sec. 2.2 (emphasis added).

86.     Despite this authority, the ESOP Trust Agreement explicitly states that the Trustee "shall serve solely in the capacity of a directed trustee within the meaning of Section 403(a)(1) of ERISA."   ESOP Trust Agreement, Sec. 1.4.  However, in certain circumstances (such as the instant matter), a directed trustee breaches its obligations under ERISA when it continues to permit continued investment in a company's securities where the company is in dire circumstances.

87.     Evincing T. Rowe Price's responsibility over the ESOP, in a communication sent to ESOP participants advising them that the Company was terminating the ESOP effective March 2, 2012, participants were advised to direct any inquiries to T. Rowe Price.

## DEFENDANTS' FIDUCIARY DUTIES

88.     **The SIP Requirements:**  According to SIP Document Sec. 3.10:

> All fiduciaries under the Plan and Trust will act solely in the interests of the Participants and their beneficiaries and in accordance with the terms and provisions of the Plan and Trust insofar as such documents are consistent with ERISA, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

89.     **The ESOP Requirements:**  According to ESOP Document Sec. 15.09:

Notwithstanding any other provision of this Plan, and the Trust Agreement, the Trustee, SOPCO and the Company shall exercise their powers and discharge their duties under this Plan and the Trust Agreement for the exclusive purpose of providing benefits to Employees and their Beneficiaries, and shall act with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

90.     **The Statutory Requirements:**  ERISA imposes strict fiduciary duties upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

91.     **The Duty of Loyalty:**  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."

92.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

93.     **The Duty of Prudence:**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

94.     **The Duty to Investigate and Monitor Investment Alternatives:**  With respect to a pension plan such as the Plans, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans including employer securities, to ensure that each investment is a suitable option for the Plans.

95.     **The Duty to Monitor Appointed Fiduciaries:**  Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plans the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a)     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b)     are knowledgeable about the operations of the Plans the goals of the Plan and the behavior of Plans' participants;

(c)     are provided with adequate financial resources to do their jobs;

(d)     have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

(e)     have access to outside, impartial advisors when needed;

(f)     maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(g)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands on fiduciaries.

96.     **The Duty to Disregard Plan Documents, if Required:**  A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

97.     **Co-Fiduciary Liability:**  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach by such other fiduciary, unless he makes   reasonable efforts under the circumstances to remedy the breach.

98.    **Non-Fiduciary Liability:** Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## SUBSTANTIVE ALLEGATIONS

99.    Kodak is headquartered in Rochester, New York.  On January 19, 2012, the Company filed for Chapter 11 bankruptcy reorganization.

100.    Throughout the Class Period, Defendants knew or should have known that Kodak stock was an imprudent investment for the Plans because the Company: (a) depended on a dying technology and the sale of antiquated products no longer sought by the consumer; (b) was unable to bring new products to the market to counter the rapidly declining profits from the sales of its antiquated products; (c) was unable to generate sufficient cash-flow from its short term business strategy of initiating lawsuits, which would presumably garner settlements, to maintain the Company's cash flow; (d) was suffering from a severe lack of liquidity; and (e) its stock price collapsed because of the above dire circumstances.   Accordingly, the continued heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plans and, consequently, to the Plans' participants.

101.    Defendants did not act prudently when they continued to permit the Plans to offer the Funds, invest Plan assets in Company stock or maintain the Plans' existing investments in Company stock.  As a consequence of the below-described facts, Defendants knew or should have known that Company stock was an imprudent investment for the Plans.  Their fiduciary duties notwithstanding, Defendants failed to protect the Plans' Participants' retirement savings from being imprudently invested in Company stock, and as a result, the Plans, and ultimately

their Participants, suffered losses.  A prudent fiduciary facing a similar circumstance would not have stood idly by as the Plans lost tens of millions of dollars.

### *History of Kodak*

102.    The history of Kodak dates back to the late nineteenth century, when George Eastman introduced the first Kodak camera.  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.  In 1930, the Eastman Kodak Company was added to the Dow Jones Industrial Average index, where it would remain until 2004. *See* http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/9024539/Kodak-130-years-of-history.html.

103.    "George Eastman built his company by turning photography from a highly skilled pursuit to a pastime for ordinary people.  The ease of use of Kodak's cameras made them enormously popular and precipitated a high-margin film business that Kodak monopolized until the 1980s."  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.

104.    According to a 2005 Harvard Business School case study[4], up until 1976, Kodak garnered 90% of U.S. film sales and 85% of U.S. camera sales.  Eventually, Kodak would comprise 80% of the market for the chemicals and paper used to develop and print photos.

105.    For most of its history, Kodak depended upon the "razor-blade strategy."  That is just as Gillette makes its money on the blades, not the razors, Kodak sold relatively inexpensive cameras, but generated a large amount of revenue from selling film, papers and chemicals.  *See* "The Last Kodak Moment?"  The Economist (January 14, 2012), available at: http://www.economist.com/node/21542796.

---

[4]    *See* Gavetti, G., Henderson, R., Giorgi, S., Kodak and the Digital Revolution (A), Harvard Business School, 2005.

106.    By 1988, the Company had grown to over 145,300 employees world-wide and its brand letter "K" framed in yellow was one of the most recognizable symbols on the planet.

107.    During this time, the Company developed a reputation with its employees.  Due to the strong history of the Company, going to work for Kodak was known as "taking the life sentence" and it became a rite of passage for generations of employees.

**Kodak's Downward Spiral Prior to the Beginning of the Class Period**

108.    Kodak's monopolization of the photography industry began to erode by the 1980s as competition began to creep in, and the industry was changing.  By the 1980s digital technology began to replace the need for film, and then more recently, smartphones deeply dented the demand for digital cameras.  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.  Moreover, competitors started to sell film at prices well below Kodak's price point for similar film.  Kodak's viability depended upon its ability to adapt to these new market forces.  Kodak failed to adapt.

109.    Kodak actually foresaw future trends.  In fact, Kodak invented the digital camera in 1975.  *See* "What's Wrong with this Picture: Kodak's 30-year Slide into Bankruptcy," *Knowledge@Wharton*, February 1, 2012, at 1.  However, out of fear that such technology would eat into the Company's film sales (which was the Company's cash cow), Kodak essentially stuck the digital camera in a vault, ignoring the inevitable industry shift that, while not imminent, would occur over the following decades.  *Id.*  This move would ultimately prove fatal.  And so, it was Sony, and not Kodak, that introduced the first digital camera to the market (the Sony Mavica in 1981).  *See* http://blog.sony.com/flashback-fridaysony-mavica-digital-camera-1981.

110.    By 2003, "the onset of digital photography eroded demand for traditional film" by so much that Kodak said it "would halt investing in its longtime product."  Michael J. De La

Merced, "Eastman Kodak Files for Bankruptcy," *NTTImes.Com*¸ January 19, 2012, at 1.  Since 2003, Kodak has closed 13 manufacturing plants and 130 processing labs.  *See* "What's Wrong with this Picture: Kodak's 30-year Slide into Bankruptcy," *Knowledge@Wharton*, February 1, 2012, at 1.

111.    By the time that the Company surrendered to the inevitability of digital cameras and began to sell them, the industry had radically shifted again, this time to cameras on smartphones which "scuppered" Kodak's digital camera business.  *Id.*  Consumers were no longer interested in buying inexpensive digital cameras (which was what Kodak had been producing) when they could get relatively comparable camera quality on their cell phone.   On the other end of the spectrum, Kodak had already been edged-out of the high-end digital camera business by the likes of Canon, Nikon and Sony.  *See* Larry Magid, "Kodak's Impending Bankruptcy Not a Pretty Picture," Forbes (January 4, 2012), available at: http://www.forbes.com/sites/larrymagid/2012/01/04/kodaks-impending-bankruptcy-not-a-pretty-picture/.

112.    By 2004, with demand for its film products eroded and having failed to capitalize on digital technology, Kodak was in a downward spiral.  Evincing this decline, the Company was removed from the basket of 30 stocks comprising the Dow Jones Industrial Average.   Kodak was left with having to bring new products to the market in order to mitigate the financial damage inflicted by loss of film sales.  It failed to do so.  *See* Michael J. De La Merced, "Eastman Kodak Files for Bankruptcy," *NTTImes.Com*¸ January 19, 2012, at 1 (noting that Kodak's strategy to "bet on inkjet printers" has "yet to bear fruit.").

113.    To combat its decline, Kodak began a four-year turnaround plan aimed at transforming the Company into a supplier of digital photography products and printers.

114.   During this business transition, Kodak incurred billions of dollars in losses, instituted steep cuts to its workforce (eliminating approximately 50% of its employees) and eliminated its dividend.

115.   Business Week released an ominous article detailing the depths of Kodak's problems in October 2005.  The article: (a) noted that Kodak was "barely breaking even" on the sale of its digital cameras; (b) quoted senior executives at the Company conceding that the company's balance sheet is "stressed"; (c) detailed how emerging markets had completely skipped over the film industry and moved right into the digital market – undermining Kodak's business strategy of having emerging markets compensate for falling film sales in the United States; and (d) detailed how the Company's Board of Directors was reorganizing Kodak to prepare for a possible sale of Company assets.  *See BusinessWeek*, *A Tense Kodak Moment*, October 17, 2005, http://www.businessweek.com/magazine/content/05_42/b3955106.htm.

116.   A primary focus of Kodak's turn-around efforts was its foray into the digital printer business, where it was competing with such industry giants as HP and Canon.  The person charged with this undertaking was Defendant Perez who joined Kodak in 2003 as President, before being promoted to CEO in 2005.  *See* Mike Spector et al., "Kodak Teeters on the Brink," *The Wall Street Journal* (January 5, 2012), available at: http://online.wsj.com/article/SB10001424052970203471004577140841495542810.html.

117.   Beginning in 2007, Kodak entered the consumer printer market, and in contrast to nearly every other company, offered an expensive printer and cheap ink.  *See* http://blog.atlanticinkjet.com/general-cartridges-posts/the-latest-printer-ink-from-kodak-inkjet-a-shift-from-the-cheap-ink-approach.html.  Kodak was essentially *employing a reverse* razor blade strategy (the opposite of its century-old business model), while its competitors in the printer

27

market were using the razor blade strategy.   Kodak hoped that nanotechnology used in filmmaking would allow the Company to manufacture an ink that would not clog printer heads. Kodak's foray into the printer business was unsuccessful.

118.     By the fourth quarter of 2008, Kodak's traditional film business had disintegrated, attempts to revive that business were wholly unsuccessful, and Kodak stock had plummeted from a high of $90 in the mid nineteen nineties to $6.58 on December 31, 2008.

119.     By February 2009, Kodak stated that it was bracing for a sales slump of between 12% and 18%"   *See* "Recession-hit Kodak Outlines New Strategy," *The Associated Press* (February 4, 2009), available at:   http://www.imaginginfo.com/web/online/News/Recession-Hit-Kodak-Outlines-New-Strategy/3$4759.

120.     On April 30, 2009, Kodak reported a loss from continuing operations of $255 million, even worse than analysts had expected.   The Company announced that it would stop paying its 25-cent semi-annual dividend.   Defendant Perez warned that the next quarter would "be a tough quarter," saying that if there were signs of recovery, it would not be until the third quarter. *See* Meg Tirrell, Kodak Shares Drop as Loss Widens More Than Estimated, *Bloomberg* (Apr. 30, 2009.  http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4yI3pyoCuCU.

121.     The quarterly loss was attributed to three factors:   the continuing impact of the global recession, business seasonality and restructuring actions taken to address the economic climate.  Consumer Digital Imaging Group ("Digital Imaging") sales were $369 million for the quarter, representing a 33% decline from the prior year quarter.  Graphic Communications Group ("Graphic Communications") sales were $603 million, a 26% decline from the first quarter of 2008.  Film, Photofinishing and Entertainment Group ("Film") sales were $503 million, a 31% decline from the year-prior quarter.  Defendant Perez stated that the Company would continue to

work on things within its control, "focusing on our core digital technologies, optimizing our portfolio of cash generating businesses, achieving the full potential of our transformational business, reducing our cost structure and conserving cash."  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (April 30, 2009).

122.   On the day of this announcement, Kodak stock closed at $3.05 per share.

123.   In June 2009, Kodak announced that it would discontinue production of its iconic Kodachrome color slide film (which had been sold since 1935).  Kodak stated that 70% of its revenue now came from digital business as opposed to film.  *See* "Kodak Retires KODACHROME Film; Celebrates Life of Oldest Film Icon in its Portfolio," (June 22, 2009), available at: http://www.kodak.com/ek/ContentWithLeftCol.aspx?Pageid=28412&id=36997.

124.   The second quarter loss was $189 million, or ($0.70) per share—the Company's third straight quarterly loss.  Worldwide sales for the quarter totaled $1.766 billion, a decline of 29% from the second quarter of 2008.  Digital Imaging sales were $503 million, a 33% decline from the prior year quarter, while Graphic Communications sales were $670 million, a decline of 24% from the prior year quarter.  Film sales were $593 million, a 30% decline from the prior year quarter.  Kodak attributed its dismal second quarter 2009 results to the "weak global economic climate," while at the same time forecasting improved results for the second half of the year.  Kodak stated that it remained focused on three financial goals: digital and total company revenue; earnings from operations; and cash generation.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (July 30, 2009).

125.   On the day of this announcement, Kodak stock closed at $2.94 per share.

126.     Kodak's third quarter, 2009 results were said to "demonstrate the success of continued focused investments that Kodak is making in new products and core growth businesses, especially consumer and commercial inkjet."  The Company's third quarter loss from continuing operations was $111 million, or ($0.41) per share.  The fact that such disappointing financial results were an "improvement" from the previous quarters' results" and were thought to illustrate "success" showed just how dire Kodak's situation had become.  In the third quarter of 2008, Kodak had earned $101 million, or $0.35 per share, a stark contrast to the loss reported for the same quarter of 2009.  In the third quarter of 2009, Digital Imaging sales were $535 million (a 35% decline from the prior year quarter), Graphic Communications sales were $674 million (an 18% decline from the prior year quarter), and Film sales were $572 million (a 25% decline from the prior year quarter).  Kodak admitted that its ability to improve in the following quarter was predicated on a "modest market improvement, the introduction of new, higher-margin digital cameras and devices, stronger demand for its Prepress products, and the benefits from a number of intellectual property transactions."  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (October 29, 2009).

127.     The loss for the full year 2009 would end up totaling $232 million, or ($0.87) per share.  The revenue for that year was down 19% from 2008.  *See* Eastman Kodak Company, Current Report (Form 8-K*), Exhibit 99.1 (January 28, 2010).

128.     Thus, by the start of the Class Period and certainly leading up to Kodak's bankruptcy filing on January 19, 2012, it had become clear that Kodak's traditional business model had lost step with the changing times to its severe detriment.  According to one observer, Kodak's "decision to shutter the business … is the strongest symbol yet of the sea change in consumer electronics and ***decades of missteps*** that forced the former blue chip to seek

bankruptcy protection…." *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3 (emphasis added).

### **_Kodak Was An Imprudent Investment During the Class Period_**

129.   By the end of 2009 the Company was a shell of its former self and clearly an imprudent investment for retirement savings.  A former blue-chip stock that once traded at over $80 per share was trading between $4 and $5 per share in January of 2010.  Despite this, on the first day of the Class Period, January 1, 2010, incredibly, the Company elected to resume matching contributions in Company Stock to Plan Participants.

130.   By the start of 2010, Kodak had ceased production of all but a few of its photo films and failed to establish a firm foothold in the high-end digital camera market.  The result was rapidly declining sales, falling share prices, ballooning quarterly losses and the onslaught of dire financial straits for the once iconic Company.[5]

131.   Due to declining revenue in its traditional business lines, Kodak embarked on a business model of intellectual property licensing and lawsuits to fund its cash needs.

132.   However, even this business model was showing signs of fatigue by the start of the Class Period.  For example, in the first nine months of 2010, the Company raised only $760 million in revenue from licensing fees.

133.   Moreover, the Company was becoming increasingly dependent on intellectual property transactions to support the Company.  For example, in the first quarter of 2010, Kodak reported earnings from operations in the Consumer Digital Imaging Group of $415 million, an

---

[5]  The first day of trading, January 4, 2010, Kodak was trading at $4.26 per share.  As of November 15, 2011, the stock had fallen to $1.16 per share – **losing some 73% of its value**.  By January of 2012, the Company's stock was delisted from the New York Stock Exchange.

increase of $572 million from the same quarter in 2009.  However, excluding the completion of a previously announced intellectual property transaction, earnings improved by only $22 million.

134.    Kodak's credit ratings for debt instruments, which would have priority in bankruptcy over stockholders, demonstrate Kodak's dire circumstances.  Over the course of the entire Class Period, Kodak's debt ratings were never investment grade, and they deteriorated from "highly speculative" to "extremely speculative" to "in default with little prospect for recovery."

Simplified Rating Agency Guidelines

| Moody's | S&P | Fitch | |
|---------|-----|-------|---|
| Aaa | AAA | AAA | Prime |
| Aa1 | AA+ | AA+ | High Investment Grade |
| Aa2 | AA | AA | |
| Aa3 | AA- | AA- | |
| A1 | A+ | A+ | Upper Medium Investment Grade |
| A2 | A | A | |
| A3 | A- | A- | |
| Baa1 | BBB+ | BBB+ | Lower Medium Investment Grade |
| Baa2 | BBB | BBB | |
| Baa3 | BBB- | BBB- | |
| Ba1 | BB+ | BB+ | Non Investment grade Speculative |
| Ba2 | BB | BB | |
| Ba3 | BB- | BB- | |
| B1 | B+ | B+ | Highly Speculative |
| B2 | B | B | |
| B3 | B- | B- | |
| Caa1 | CCC+ | CCC | Substantial risks |
| Caa2 | CCC | | Extremely speculative |
| Caa3 | CCC- | | In default with little prospect for recovery |
| Ca | CC | | |
| / | D | DDD | In default |

Kodak Credit Ratings*

**Moody's:**

2/10/2009 cut from B1 to B3
3/3/2011 cut from B3 to Caa1
9/27/2011 cut from Caa1 to Caa3

**S&P:**

3/5/2009 cut from B to B-
2/28/2011 cut from B- to CCC

**Fitch:**

1/30/2009 cut from B to B-
2/24/2011 cut from B- to CCC
9/28/2011 cut from CCC to CC

* as reported via Bloomberg database "EK US EQUITY CRPR"

135.    It was clear that Kodak was rapidly heading towards bankruptcy. The probability of a company entering bankruptcy can be calculated using a financial analytical tool called an Altman Z-score ("Z-score"). The Z-score formula for predicting bankruptcy is a multivariate formula that measures the financial health of a company and predicts the probability of bankruptcy within two years. A score above 3 demonstrates bankruptcy is not likely and a score below 1.8 demonstrates bankruptcy is likely. Studies measuring the effectiveness of the Z-score have shown the model

to be accurate in greater than 70% of its applications.  Kodak's Z-Score was below 1.8 every quarter from the beginning of the Class Period as reported via Bloomberg database "EK US EQUITY AZS":

| Date | Z-Score* |
|------|----------|
| 12/31/2009 | 1.148 |
| 03/31/2010 | 1.682 |
| 06/30/2010 | 1.646 |
| 09/30/2010 | 1.67 |
| 12/31/2010 | .6412 |
| 03/31/2011 | .1027 |
| 06/30/2011 | 0.029 |

136.    The credit ratings issued by Moody's, S&P, and Fitch are regularly used by investors to measure investment risk. The Altman Z-Score is also regularly used by investors to measure risk of a particular investment.  These tools should have apprised Defendants of the extraordinarily high risk associated with investing in Kodak stock throughout the Class Period. Further, these tools should have apprised Defendants that Kodak stock was a highly speculative investment and clearly not a prudent investment for long term retirement savings.

137.    On January 28, 2010, Kodak announced a Company loss of $232 million, or $0.87 per share for 2009.  When the Company filed its quarterly report with the SEC on February 4, 2010, however, the Form 8-K filing represented that the Company's "strategy is working" and that the Company was "on track toward sustained profitability" due to the Company having "solid liquidity and the financial flexibility necessary to fully implement" its strategy.

138.    On February 25, 2010, Bloomberg News reported that Kodak 9.75 Notes had fallen 0.22 cents on the dollar.

34

139.    On April 29, 2010, the Company forecasted a loss of as much as $150 million from continuing operations for the full year and expected overall revenue growth of 0%-1%. This news caused Company shares to plunge 17%.

140.    On July 28, 2010, Kodak reported a second quarter loss of $0.51 per share, a wider loss than consensus estimates, for a loss of $0.32 per share.  The Company also announced that revenues had fallen 11% year-over-year to $1.77 billion.

141.    The following day, Citigroup, Inc. lowered its price target on Kodak from $5 to $4 while maintaining its "sell" rating.

142.    A July 30, 2010 Bloomberg article entitled "Kodak's Turnaround Story Getting Old" reported that shares of Kodak had dropped 50% since April, reducing its market cap to below $1.2 billion.  The article also noted that "a group of analysts at Standard & Poor's has placed the Company atop its list of likely targets for leveraged buyouts in 2010."

143.    On October 28, 2010, the Company filed with the SEC a Company press release on Form 8-K, announcing its third-quarter 2010 results that reflect losses from continuing operations of $43 million, or $0.16 per share.  Despite this dismal news, the SEC filing touted the Company's recent financing transactions regarding it debt maturity and asserted that the "transactions provide the Company with increased financial flexibility . . ." Such statements contrasted sharply from earlier reports that analysts at Standard & Poor's had placed the Company atop its list of likely targets for leveraged buyouts.

144.    On December 10, 2010, the price of Kodak stock had declined so far that it was removed from the S&P 500 index.

145.    On December 31, 2010, Kodak's Z-score fell to 0.6412, approximately 65% below the level at which bankruptcy was likely.

35

146.    By 2011, Kodak's new IP licensing-based business model had failed.   For instance, in the first six months of 2011, Kodak collected only $27 million in patent-licensing fees.

147.    The Company's traditional revenue streams were also evaporating further.  Kodak began 2011 by announcing dismal results.

148.    On January 26, 2011, Kodak reported its earnings for the fourth quarter of 2010 on a Form 8-K announcing its 2010 results which reflected revenues for the fourth quarter of 2010 of $1.927 billion, a 25% decrease from the year-ago quarter.  The release also reflected earnings from continuing operations of $33 million, compared with earnings on the same basis of $430 million in the year-ago period, an almost 95% drop in profits, reflecting primarily lower intellectual property licensing revenues for the fourth quarter of 2010.

149.    Due to these atrocious results, and reports that the U.S. International Trade Commission would rule that Kodak's patent infringement claims against Apple and Research In Motion were "invalid," Kodak had the inauspicious distinction of back-to-back double digit declines.

150.    On Tuesday, January 25, 2011, the Company's stock fell 13.4% to close at $4.52 per share.  The following day, Kodak stock fell nearly 18%.

151.    The response of the investment community was negative.   Under the heading "Fundamentals deteriorate further," Chris Whitmore from Deutsche Bank, in a report dated January 26, 2011, described Kodak's "core business as challenged and under severe secular pressure."  He also noted that Kodak "burned" approximately $1 billion in cash in 2010 and that the risk to Kodak of being able to monetize IP payments "to offset severe losses in other businesses" had increased dramatically.  Deutsche Bank maintained its "sell" rating.

152.    Shannon Cross, a research analyst at Cross Research, stated that Kodak's "results reflect negative trends in the underlying business…"  Cross Research had a "sell" rating on Kodak.

153.    A Reuters article dated January 27, 2011 entitled "Kodak's Shares Plummet After a Negative Earnings Report" stated that "Kodak has suffered as people abandoned printed film for digital cameras."

154.    Soon thereafter, Kodak held an "analyst day" at which it discussed the prospects of the Company with securities analysts.  It was described by Deutsche Bank as "uninspiring."  In particular, in a report dated February 3, 2011, Deutsche Bank cut Kodak's revenue and earnings estimates again and maintained its sell rating.  It noted that "underlying cash burn appears set to continue."

155.    On February 24, 2011, Fitch cut Kodak's credit rating from B- to CCC.

156.    By March 31, 2011, Kodak's Z-score had fallen again to only 0.1027, more than 10 times *worse* than the score of 1.8 which indicates that a company is likely to go bankrupt.

157.    In April 2011, Kodak announced its first-quarter results.  Kodak continued its longstanding trend when it announced another quarterly loss.  Unfortunately, Kodak's quarterly loss was larger than expected with its film business revenue declining by some 14%.  Overall, Kodak reported a loss from its continuing operations of $249 million, or $0.92 per share.  A year earlier, Kodak reported profits of $119 million, or $0.40 per share.  News of these results sent Kodak's shares tumbling some 10%.

158.    By the end of June 2011, Kodak had liabilities that exceeded its assets by $1.4 billion.  Moreover, Kodak's share price **has lost over three-quarters of its value since the start of 2011**.  Moreover, the Z-score and fallen to an incredibly low 0.029.

37

159.     On July 26, 2011, Kodak announced its second-quarter results for 2011.   Losses from continuing operations increased to $179 million or $0.67 per share, up from a loss of $167 million or $0.62 per share a year earlier.   In addition, revenue fell 5% to $1.49 billion.   This was Kodak's fifth consecutive quarter of reporting a loss.

160.     Further eroding the Company's ability to continue as a going concern, Kodak was burning through cash at an astonishing rate.   For instance, in January 2011, the Company had $1.6 billion in cash.   Six months later, it had less than $960 million in cash left in its coffers.

161.     On July 27, 2011, The Wall Street Journal noted that Kodak burned through $300 million in cash in the second quarter alone and that "the results highlighted the challenges that remain as the company seeks to refocus its operations around commercial and consumer printing."   Kodak's CEO was quoted as saying that the challenges facing the company were so enormous that they were "the challenges typical in the creation of new businesses."   In other words, Kodak ceased to be its former self and instead was a new and much riskier start-up company that was in dire circumstances.

162.     By August of 2011, Kodak stock was trading below $2 per share; a price it had not traded at since the early 1950s.

163.     On August 5, 2011, the Dow Jones Newswire reported that Kodak might sell the Company's patents and use the proceeds for general corporate purposes and thereby "stiff" the junk-bond holders whose bonds were secured by a security interest in Kodak's intellectual property.

164.     On August 11, 2011, the Wall Street Journal noted in an article entitled "Kodak Struggles to Find Its Moment" that "[a]fter three decades of serial reorganizations, Eastman Kodak Co. is struggling to stay in the picture."   It stated that Kodak first lost most of its film

business to foreign competitors, and "then mishandled the transition to digital cameras."  "Now it is quickly burning through cash as it remakes itself into a company that sells printers and ink."

165.     Moreover, the August 11 article noted that Kodak bonds were selling "below 80% on the dollar, signaling the market sees a risk of default."  And, Deutsch Bank was quoted as saying, "[i]t was a disappointing quarter in cash-flow burn, topline growth and overall growth."  "They are selling the family silver to keep the lights on."

166.     As Kodak drew upon revolving credit lines, it became apparent that the Company was not only burning through cash at an accelerating rate, but  it appeared likely that Kodak would not be able to sell off its patent portfolio before it ran out of cash.  According to Scott Dinsdale, an analyst at KDP Investment Advisors, "They could run out of cash in early 2012."

167.     On September 1, 2011, Bloomberg Business Week reported that "fears about Kodak's viability threatened to overwhelm Chief Executive Officer Antonio M. Perez's efforts to rescue the iconic brand."

168.     In September 2011, facing declining liquidity, the Company tapped a $160 million line of credit to pay "for general corporate purposes."

169.     On September 26, 2011, in reporting on Kodak accessing this line of credit, Reuters noted this action "rais[ed] concerns about cash flow generation" and Kodak's "ability to compete with digital rivals under the strategy set forth by CEO Antonio Perez."  In the article, KDP Asset Management was reported to have said that "Kodak's borrowing is an attempt to 'grab whatever is available' and could be a signal that the company is burning too much cash. [It] added that the company could file for bankruptcy 'between now and 2012.'"

170.     That same day, the Motley Fool suggested that Kodak "could use some tips from personal finance expert Suze Orman" because it "hasn't been managing its budget very well and

has been living paycheck to paycheck for a very long time, a tough habit to break." The article further stated that, "[u]nfortunately for Kodak, its paychecks and patent-trolling days are numbered."

171.    The next day, Bloomberg reported that the borrowing "signals the 131-year-old camera maker is using cash at an accelerating rate, raising concern the company will be unable to sell a portfolio of patents before it runs out of money."  It further noted that, according to Argus Research Group, "[t]he company may be exacerbating its cash burn by shifting focus to inkjet printers and commercial presses."  KDP was quoted, in the article, as stating that Kodak "could run out of cash in early 2012."

172.    On September 27, 2011, Moody's downgraded Kodak's credit rating from Caa1 to Caa3.

173.    The following day, Fitch also downgraded Kodak's credit rating to a CC level, a level indicative of "default of some kind appears probable."  In issuing its downgrade, Fitch indicated that there was an "insufficient" scale in Kodak's purported growth areas including consumer and commercial printing – the key portion of Kodak's turnaround effort.

174.    On September 28, 2011, cnnmoney.com published "Kodak: Death of an American Icon?" The article noted that the additional borrowing "pushed Kodak even deeper into 'junk' status." It further stated that Kodak is "one of the biggest money losers in the Fortune 500" and that "investors need to be extremely careful."  According to CNN, "[i]f there's any reason to be optimistic about Kodak, you have to look at its intellectual property." But, because of litigation before the International Trade Commission, "betting that Kodak may hit the patent jackpot is highly risky."

175.     On September 28, 2011 Moody's downgraded all of its debt ratings on Kodak citing "weakness in the company's core business operations" and "weaker cash flow prospects." The ratings were lowered to "Caa2" from "Caa1" for probability of default rating and to "Caa3" from "Caa2" on its senior unsecured rating.  Both ratings were well into non-investment grade territory.

176.     On September 29, 2011, the Motley Fool reported that Investment Partners Asset Management, one of Kodak's institutional investors, called on other large institutional investors to "rally and enact change before it's too late," adding "the status quo cannot continue."

177.     In response to these reports of Kodak's dismal performance, on September 29, 2011, Kodak employees received a letter from the Company's CEO, Antonio Perez.  One Kodak employee described the message from the CEO as "just telling us to hang in there."  *See Kodak employee shares his concerns with News 10NBC*, http://www.whec.com/news/stories/s2308500.shtml.

178.     On Friday, September 30, 2011, the price of Kodak stock plunged when it was disclosed that the Company had hired the law firm Jones Day, a renowned bankruptcy firm, for restructuring advice.  According to reports, "bankruptcy is among the options being considered."

179.     Trading of Kodak stock was temporarily halted that day due to the precipitous decline in its share price.  **In a single day alone, Kodak lost over 50% of its value before trading was halted**.

180.     The next day, October 1, 2011, the New York Times reported that a "person briefed on the matter" said that "Kodak is considering filing for bankruptcy as it explores ways to lift its sagging fortunes…." In the same article, Cross Research was quoted as follows: "[W]e

took the price target down to a dollar.  We were anticipating that the equity was virtually worthless."

181.    During this time, the bond market gave clear signals that indicated that Kodak bore a high risk of default.   For example, on October 1, The Wall Street Journal reported that one of Kodak's bonds, with a maturity date of 2013, was trading in the Fall of 2011 at "26 cents on the dollar", down from 76.5 cents only a week earlier.  *See Kodak Seeks Help as Fears Mount*, The Wall Street Journal, October 1, 2011, http://online.wsj.com/article/ SB10001424052970204138204576603053167627950.html.

182.    Numerous analysts adjusted their rating of the stock to "sell."

183.    In October 2011, Citi analyst Richard Gardner reiterated his "sell" rating for Kodak.  In issuing his report, Gardner stated that Kodak's "recent withdrawal of $160M from its line of credit provides evidence of the company's inability to monetize its IP portfolio."  *See Kodak: Citi Says Sell*, *IP Goals Slipping, Barron's*, October 6, 2011, http://blogs.barrons.com/ techtraderdaily/2011/10/06/kodak-citi-says-sell-revenue-target.

184.    In effort to sustain its operations, Kodak had announced a strategy whereby it intended to sell parts of its 1,000 patent portfolio to generate cash through Lazard LLC.  It was estimated that Kodak's patent portfolio was worth more than the Company itself.

185.    In October of 2011, however, patent expert Alexander Poltorak told TheStreet.com that valuable patents typically sold between $200,000 and $250,000 each, which would mean that Kodak's patent sale could garner only approximately $250 million.  *See TheStreet.com*, *Apple*, *Google*, *RIMM*; *Kodak's Patent Buyers*, October 10, 2011. www.thestreet.com/print/story/11272680.html.   Poltorak's estimated value of Kodak's patent

portfolio was dramatically below the approximately $3 billion valuation some analysts gave to the portfolio.[6]

186.    On October 12, 2011, Bloomberg reported that creditors holding Kodak second-lien debt secured by Kodak's intellectual property had hired bankruptcy lawyers and restructuring advisors.  According to the article, CRT Capital Group stated that "[t]his may come to a head soon as potential buyers are hesitant to do anything outside of bankruptcy which could lead to a cash crunch."

187.    On October 20, 2011, the New York Times reported on analyst views of Kodak's attempt to transform "into a giant in the inkjet printer business, even as printouts are increasingly being replaced with electronic copies on computers, tablets and smartphones." According to Deutsch Bank, Kodak was "jumping 'from one buggy whip business to another.'"

188.    On November 3, 2011, Kodak warned that its survival over the next year hinged on its ability to either sell its patent portfolio or raise cash through selling bonds.

189.    That same day, the Company announced its third-quarter 2011 results:

> The company reported a third-quarter loss from continuing operations of $222 million, or $0.83 per share, compared with a loss from continuing operations on the same basis of $43 million, or $0.16 per share, in the year ago period. The results largely reflect the absence of sizable patent licensing revenue in this year's third quarter versus the year-ago period and the continued secular decline of traditional products....

190.    Despite announcing that its survival was in jeopardy, CEO Perez told analysts that "[t]hese required statements shouldn't be misunderstood in any way as dampening of my

---

[6]   The value of the patent portfolio sale was questionable at best.  As Poltorak stated at that time, the value of Kodak's patent portfolio could be even lower if Kodak has exhausted the patents' value – i.e., Kodak has already marketed most of the patent's license.  Further, Kodak's CEO Perez had stated publicly that he only wanted to sell "the part of the portfolio that does not apply to the core investments and the future of the company."  *See* *TheStreet.com*, *Apple*, *Google*, *RIMM*; *Kodak's Patent Buyers*, October 10, 2011, www.thestreet.com/print/story/11272680.html. Even more disconcerting, at the time, Kodak's patent portfolio sale was compared to the patent portfolio sale Nortel (a telecommunications company) engaged in.  Ominously, Nortel's sale, however, was not consummated until after Nortel filed for bankruptcy.

optimism in our ability to complete the sale of our digital-imaging patent portfolio, which is very high." *See Kodak posts wider loss, warns on prospects*, November 3, 2011, http://finance.yahoo.com/news/Kodak-posts-wider-loss-warns-apf-3067669817.html?x=0. Further, in a November 3rd memo to the Company's employees, Perez told employees "[i]f I could write the headlines for the Kodak news stories that will appear today, I'd write this: Kodak Makes Steady Progress in Digital Transformation During Challenging Times." *See* "Squeeze Tightens on Kodak," *Wall Street Journal* (Nov. 4, 2011). http://online.wsj.com/article/SB10001424052970203716204577015531999097686.html.

191.    On November 8, 2011, Moody's said Kodak would run out of cash in 2012, stating that Kodak would be challenged "without first establishing a better liquidity position" to rectify what is now "precarious liquidity." Moody's called Kodak's efforts to pledge assets for new financing "akin to putting the last logs on the fire" since "new debt would likely consume the last few remaining forms of alternative financing."

192.    Kodak's long-time supporter, Bill Miller of Legg Mason Capital Management, announced on November 10, 2011, that he had sold all of his Kodak stock. Notably, at the beginning of 2011, Legg Mason owned 32 million shares of Kodak stock and was the largest institutional investor in Kodak stock.[7]  *See Bill Miller Is Done Losing Money on Kodak*, November 10, 2011, http://blogs.wsj.com/deals/2011/11/10/bill-miller-is-done-losing-money-on-kodak/. According to the Company's Definitive Proxy Statement, filed with the SEC on March 30, 2011, the 32 million shares Legg Mason Capital Management previously held represented over 12% of the Company's total outstanding shares.

---

[7] Legg Mason sold some 11 million shares of Kodak stock in the third quarter of 2011, and sold the remaining 7.9 million shares in October of 2011.  *See Bill Miller Is Done Losing Money on Kodak*, November 10, 2011, http://blogs.wsj.com/deals/2011/11/10/bill-miller-is-done-losing-money-on-kodak/.

193.   Ominously, that same securities filing disclosed that nearly 46% of the Company's common shares were beneficially owned by only four entities, including Legg Mason Capital Management.   *See* Kodak Definitive Proxy Statement, filed with the SEC on March 30, 2011, at 30.   Consequently, the wholesale liquidation of Kodak stock by one of the Company's key supporters should have sent a clear signal to the Plan's fiduciaries that the Street no longer had faith in the Kodak.

194.   On January 3, 2012, the Company announced that it received a continued listing standards notice from the New York Stock Exchange ("NYSE") because the average closing price of the Company's Stock was less than $1.00 per share over a period of thirty (30) consecutive trading days.

195.   On January 4, 2012, The Wall Street Journal reported that Kodak shares had declined to $0.47 and that the Company might file for bankruptcy protection if it could not sell digital patents.

196.   On January 5, 2012, Moody's cut ratings on about $1 billion of Kodak's debt, citing "a heightened probability of a bankruptcy" as liquidity continued to deteriorate.

197.   On January 19, 2012, the Company announced that it and its U.S. subsidiaries filed voluntary petitions for Chapter 11 business reorganization in the U.S. Bankruptcy Court for the Southern District of New York.

198.   On January 20, 2012, the Daily Mirror reported that bankruptcy protection was a last-ditch move for the Company: "Kodak has already reorganized its business to focus on printers, but this has failed to restore profitability.  The Company has closed 13 manufacturing plants and 130 processing labs since 2003."

199.     On January 24, 2012, Kodak projected a $363.7 million cash loss over the thirteen weeks ending April 6, 2012, in a presentation to lenders.

200.     On February 9, 2012, Kodak said it would stop making digital cameras, pocket video cameras and digital picture frames and will license its brand to other manufacturers. According to an article in the Wall Street Journal, entitled "Kodak Shutters Camera Business," "the decision… is the strongest symbol yet of the sea change in consumer electronics and decades of missteps that forced the former-blue chip company to seek bankruptcy protection."

201.     In February of 2012, the Company announced that it was discontinuing the ESOP.

202.     The following month, the Company began to release details of what had driven it into bankruptcy at the beginning of the year.  Among the reasons: (i) US sales in its consumer business were halved to $864 million and were down worldwide by 36%; (ii) a collapse in its licensing revenue; and (iii) doubling of losses at its Graphic Communications Group.  The Company's total loss for 2011 was $764 million, with sales down 16%.  In short, the Company was awash in red.

203.     Indicative of the Company's collapse, in the early 1980s the Company employed over 60,000 employees in its hometown of Rochester, New York, making it the town's largest employer.  By the end of 2011, the Company had only approximately 7,100 employees in Rochester and was no longer even one of the top three employers there.

204.     A photography professor at Ryerson University in Toronto, Robert Burley, recently described Kodak's demise as a "train wreck" occurring over the last five years.  *See In Kodak's troubles, a snapshot of an icon's fall*, October 5, 2011, http://finance.yahoo.com/news/In-Kodaks-troubles-a-snapshot-apf-3263086625.html?x=0.

205.    On September 11, 2012, Kodak announced that it was replacing its CFO, appointing AlixPartners managing director Becky Roof on an interim basis.  News articles noted that Ms. Roof had bankruptcy experience which included conducting liquidations as well as restructurings.   "Kodak's New CFO Brings Restructuring, Liquidation Chops," *Wall Street Journal, CFO Journal* (Sept. 11, 2012).

206.    As further evidence that the Company's financial condition might be so dire that liquidation might be necessary, on September 14, 2012, the Company announced that it was indefinitely postponing its patent auction.  Although Kodak had hoped to sell the entire portfolio when the auction began in August, as reported in the *Wall Street Journal,* "[I]nitial bids came in around $150 million to $250 million, according to people familiar with the process—well below the $2.6 billion Kodak earlier this year said the patents could be worth."   "Kodak's Patent Auction Falters," *Wall Street Journal* (Sept. 14, 2012).

207.    Throughout the Class Period, Defendants took no action to protect the Plans' assets. Instead, Defendants imprudently allowed the Plans to continue offering the Funds as investment options and they continued to invest the Plans' assets in Kodak stock when it was no longer prudent to do so as a result of the Company's dire circumstances as alleged above.

208.    Evincing the utter magnitude of Defendants' failure to acknowledge their fiduciary transgressions, in a communication sent to ESOP Participants advising them of the ESOP's termination due to the uncertainty of "whether equity holders will receive a meaningful recovery at the conclusion of Kodak's chapter 11 proceeding," Participants were advised that they were able to receive their plan distribution in Kodak stock.

***Defendants Knew or Should Have Known That Kodak Common Stock Was An Imprudent Investment For The Plans, Yet Failed To Protect the Plans' Participants***

209.    Because of their high ranking positions within the Company and/or their status as the Plans' fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

210.    In particular, Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and devastate Participants' retirement savings as the truth became known and the Company's condition worsened.   Yet, Defendants failed to protect the Plans and their Participants from entirely foreseeable losses.

211.    As a result of the enormous erosion of the value of Kodak's stock, the Plans' Participants, the retirement savings of whom were heavily invested in Kodak stock, suffered unnecessary and unacceptable losses.

212.    Defendants failed to conduct an appropriate investigation into whether Kodak stock was a prudent investment for the Plans.   An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Kodak stock was clearly imprudent.   A prudent fiduciary acting under similar circumstances would have determined that the Funds were not prudent investments and acted to protect participants against unnecessary losses, and would have made different investment decisions.

213.    Because Defendants knew or should have known that Kodak was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their Participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Kodak stock.

214.     Defendants had available to them several different options for satisfying this duty, including, among other things: removing the Fund as an investment option; divesting the Plans of Kodak stock; discontinuing further contributions to and/or investment in Kodak stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Kodak they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Kodak stock.

215.     Despite the availability of these and other options, Defendants failed to take reasonable, prudent action to protect participants from losses resulting from the Plans' investment in Kodak stock.  In fact, Defendants continued to offer and to allow investment of the Plans' assets in Company stock even as Kodak's problems came to light.

## CAUSES OF ACTION

### Count I:  Failure to Prudently and Loyally Manage the Plan and Assets of the SIP

216.     Plaintiffs incorporate by reference the paragraphs above.

217.     This Count alleges fiduciary breach against all Defendants other than Defendant T. Rowe Price and Defendant SOPCO (the "SIP Prudence Defendants").

218.     As alleged above, during the Class Period, the SIP Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

219.     As alleged above, the scope of the fiduciary duties and responsibilities of the SIP Prudence Defendants included managing the assets of the SIP for the sole and exclusive benefit

of SIP Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. The SIP Prudence Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the SIP and directing the trustee regarding the same, determining how to invest Fund assets as "advisable," evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the SIP assets were invested prudently.

220.    According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

221.    The SIP Prudence Defendants were obliged to prudently and loyally manage all of the SIP assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

222.    The SIP Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of offering the Fund, and investing Plan assets in the Fund and Fund assets in Company stock, but had no such procedure. They failed to conduct an appropriate investigation of the merits of continued investment in Company stock. Given the widespread public disclosure of Kodak's dire circumstances, such an investigation would have

revealed to a reasonably prudent fiduciary the imprudence of continuing to offer the Fund as an investment option or make and maintain investment in Company stock under these circumstances.

223.     Contrary to their duties and obligations under the SIP Documents and ERISA, the SIP Prudence Defendants failed to loyally and prudently manage the assets of the SIP. Specifically, during the Class Period, these Defendants knew or should have known that Kodak stock was no longer a suitable and appropriate investment for the SIP, but was, instead, an imprudent investment in light of widely available public information.

224.     Nonetheless, during the Class Period, these Defendants continued to permit the SIP to offer Kodak stock as an investment option and continued to permit the SIP to invest in Company stock.  They did so despite the fact that they knew or should have known that Kodak was in dire circumstances.

225.     The SIP Prudence Defendants breached their fiduciary duty respecting the SIP's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the SIP to offer the Fund or to invest in Kodak stock.

226.     Given the information described above, the SIP Prudence Defendants could not possibly have acted prudently when they continued to offer Kodak stock or invest the SIP's assets in Company stock because, among other reasons:

(a)     The SIP Prudence Defendants knew of and/or failed to investigate the Company's dire circumstances as alleged above;

(b)     The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investment in company stock.

227.    Knowing of this extraordinary risk, the SIP Prudence Defendants had a duty to avoid permitting the SIP or any Participant from investing the SIP's assets in Company stock.

228.    Further, knowing that the SIP was not adequately diversified, but was heavily invested in Company stock, the SIP Prudence Defendants had a heightened responsibility to divest the SIP of Company stock when it was imprudent.

229.    The SIP Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning offering Company stock as an option or the SIP's investment in Company stock; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the SIP; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the SIP's investment in Company stock.

230.    As a consequence of the SIP Prudence Defendants' breaches of fiduciary duty alleged in this Count, the SIP suffered tremendous losses.  If the SIP Prudence Defendants had discharged their fiduciary duties to prudently invest the SIP's assets, the losses suffered by the SIP would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the SIP, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

231.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the SIP Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Count II:  Failure to Prudently and Loyally Manage the Plan and Assets of the ESOP**

232.    Plaintiffs incorporate by reference the paragraphs above.

233.    This Count alleges fiduciary breach against all Defendants other than Defendants SIPCO, Boston Safe Deposit and BNY Mellon (the "ESOP Prudence Defendants").

234.    As alleged above, during the Class Period, the ESOP Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

235.    As alleged above, the scope of the fiduciary duties and responsibilities of the ESOP Prudence Defendants included managing the assets of the ESOP for the sole and exclusive benefit of ESOP Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The ESOP Prudence Defendants were directly responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, and directing the trustee regarding the same, determining how to invest ESOP assets and directing the Trustee regarding the same, and evaluating the merits of the ESOP Plan on an ongoing basis.

236.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's

53

investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) he has acted accordingly.

237.    The ESOP Prudence Defendants were obliged to prudently and loyally manage all of the ESOP assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

238.    The ESOP Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of offering the Fund and investing in the Company stock, but had no such procedure.  They failed to conduct an appropriate investigation of the merits of continued investment in the Company stock.  Given the widespread public disclosure of Kodak's dire circumstances, such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to offer Company stock as an investment option or make and maintain investment in Kodak stock under these circumstances.

239.    Contrary to their duties and obligations under the ESOP documents and ERISA, the ESOP Prudence Defendants failed to loyally and prudently manage the assets of the ESOP.  Specifically, during the Class Period, these Defendants knew or should have known that Kodak stock was no longer a suitable and appropriate investment for the ESOP, but was, instead, an imprudent investment in light of widely available public information.

240.    Nonetheless, during the Class Period, these Defendants continued to permit the ESOP to offer Kodak stock as an investment option and invest in Kodak stock.  They did so despite the fact that they knew or should have known that Kodak was in dire circumstances.

241.    The ESOP Prudence Defendants breached their fiduciary duty respecting the ESOP Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions and, in particular, would not have permitted the ESOP Plan to offer the Fund or to invest in Kodak stock.

242.    Given the information described above, the ESOP Prudence Defendants could not possibly have acted prudently when they continued to offer Company stock because, among other reasons:

    (a)    The ESOP Prudence Defendants knew of and/or failed to investigate the Company's dire circumstances as alleged above.

    (b)    The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with retirement plan investment in Company stock.

243.    Knowing of this extraordinary risk, the ESOP Prudence Defendants had a duty to avoid permitting the ESOP Plan from investing assets in Company stock.

244.    The ESOP Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning offering Company stock as an option and investing in Company stock; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the ESOP; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's dire circumstances; and by otherwise

placing their own and the Company's improper interests above the interests of the Participants with respect to the ESOP Plan's investment in Company stock.

245.    As a consequence of the ESOP Prudence Defendants' breaches of fiduciary duty alleged in this Count, the ESOP Plan suffered tremendous losses.  If the Prudence Defendants had discharged their fiduciary duties, the losses suffered by the ESOP Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the ESOP Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

246.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the ESOP Prudence Defendants are liable to restore the losses to the ESOP Plan and Participants caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### Count III Co-Fiduciary Liability

247.    Plaintiffs incorporate by reference the allegations above.

248.    This Count alleges co-fiduciary liability against all Defendants (the "Co-fiduciary Defendants").

249.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

250.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a

breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-fiduciary Defendants breached all three provisions.

251.    **Knowledge of a Breach and Failure to Remedy:**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.   Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

252.    **Knowing Participation in a Breach:**  ERISA  §  405(a)(1),  29  U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.   Moreover, as alleged above, each of the Defendants participated in the management of the SIP and ESOP Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

253.    **Enabling a Breach:**   ERISA  §  405(a)(2),  29  U.S.C.  §  1105(a)(2),  imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

254.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the SIP and ESOP Plan, other Participants and beneficiaries, lost millions of dollars of retirement savings.

255.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-fiduciary Defendants are liable to restore the losses to the SIP and ESOP Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

256.    The Plans suffered millions of dollars in losses of vested benefits because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

257.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plans of Company stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

258.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plans' assets should not have been invested in Kodak stock during the Class Period.

259.    As a consequence of the Defendants' breaches, the Plans suffered a significant loss of vested benefits.

260.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires

"any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

261.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:

(a)    a monetary payment to the Plans to make good to the Plans the loss of benefits to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)    reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)    taxable costs and interest on these amounts, as provided by law; and such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plans resulting from imprudent investment of the Plans' assets; to restore to the Plans all profits the Defendants made through use of the Plans' assets; and to restore to the Plans all profits which the Plans and participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligation;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Company stock;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated:  September 14, 2012                    BLITMAN & KING LLP


                                             By: /s *Jules L. Smith*
                                                  Jules L. Smith
                                             The Powers Building, Suite 500
                                             16 West Main Street
                                             Rochester, New York 14614
                                             Telephone: (585) 232-5600
                                             Facsimile: (585) 232-7738
                                             Email: jlsmith@bklawyers.com

                                              *Interim Liaison Class Counsel*

                                             Gerald D. Wells, III
                                             Robert J. Gray
                                             FARUQI & FARUQI, LLP
                                             101 Greenwood Avenue, Suite 600
                                             Jenkintown, PA 19046
                                             Telephone: (215) 277-5770
                                             Facsimile:  (215) 277-5771
                                             Email: jwells@faruqilaw.com
                                                       rgray@faruqilaw.com

                                             Robert A. Izard
                                             Mark P. Kindall
                                             Nancy A. Kulesa
                                             IZARD NOBEL LLP
                                             29 South Main Street, Suite 215
                                             West Hartford, CT 06107
                                             Telephone: (860) 493-6292
                                             Facsimile:  (860) 493-6290
                                             Email: rizard@izardnobel.com
                                                       mkindall@izardnobel.com
                                                       nkulesa@izardnobel.com

                                             *Interim Co-Lead Class Counsel*

61